IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SPORTS/FACILITY, LLC; WASHINGTON FRONTIER LEAGUE BASEBALL, LLC; WASHCO BALLPARK MANAGEMENT, LLC; WASHINGTON COUNTY FAMILY ENTERTAINMENT, LLC; and HOME PLATE CONCESSIONS, LLC,<br><br>Plaintiffs,<br>vs.<br><br>THE CINCINNATI INSURANCE COMPANY; THE CINCINNATI CASUALTY COMPANY; and THE CINCINNATI INDEMNITY COMPANY,<br><br>Defendants. | Case No.: 2:20-cv-1727 |

## COMPLAINT

Plaintiffs Sports/Facility, LLC, Washington Frontier League Baseball, LLC, Washco Ballpark Management, LLC, Washington County Family Entertainment, LLC, and Home Plate Concessions, LLC (collectively the "Insureds"), by their undersigned counsel, file this Complaint against Defendants The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company (collectively "Cincinnati").

### NATURE OF THE CASE

1. This is a civil action for declaratory relief and breach of contract arising from the Insureds' contract of insurance with Cincinnati

2. At the direction of local, state, and/or federal authorities, and/or due to the COVID-19 pandemic and public health emergency, the Insureds were forced to temporarily close their semiprofessional minor league baseball operations on or around March 17, 2020, causing an interruption to and loss of their business income.

3.  The Insureds purchased and paid for an "all-risk" Commercial Property Coverage insurance policy from Cincinnati, which provides broad property insurance coverage for all non-excluded, lost business income, including the losses averred herein.

4.  The Insureds submitted timely notice of a claim for coverage to Cincinnati, but Cincinnati has wrongfully refused to honor its obligations under the "all-risk" policy purchased by the Insureds and provide the purchased coverage to its Insureds in response to their claim for benefits under the subject policy.

## PARTIES

5.  Sports/Facility, LLC is a Pennsylvania limited liability company, whose members are adult individuals who are citizens of the Commonwealth of Pennsylvania.

6.  Washington Frontier League Baseball, LLC is a Pennsylvania limited liability company. The sole member of Washington Frontier League Baseball, LLC is Sports/Facility, LLC, also a Pennsylvania limited liability company. The members of Sports/Facility, LLC are adult individuals who are citizens of the Commonwealth of Pennsylvania.

7.  Washco Ballpark Management, LLC is a Pennsylvania limited liability company. The members of Washco Ballpark Management, LLC are adult individuals who are citizens of the Commonwealth of Pennsylvania.

8.  Washington County Family Entertainment, LLC is a Pennsylvania limited liability company. The sole member of Washington County Family Entertainment, LLC is Sports/Facility, LLC, also a Pennsylvania limited liability company. The members of Sports/Facility, LLC are adult individuals who are citizens of the Commonwealth of Pennsylvania.

9.  Home Plate Concessions, LLC is a Pennsylvania limited liability company. The sole member of Home Plate Concessions, LLC is Sports/Facility, LLC, also a Pennsylvania limited

liability company. The members of Sports/Facility, LLC are adult individuals who are citizens of the Commonwealth of Pennsylvania.

10. The Insureds conduct semiprofessional minor league baseball operations located at One Washington Federal Way, Washington Pennsylvania 15301 (the "Covered Property").

11. Defendant The Cincinnati Insurance Company ("Cincinnati Insurance"), is the wholly-owned subsidiary of The Cincinnati Financial Corporation, an Ohio corporation headquartered in Fairfield, Ohio. Defendants The Cincinnati Casualty Company ("Cincinnati Casualty") and Cincinnati Indemnity Company ("Cincinnati Indemnity") are wholly-owned subsidiaries of Cincinnati Insurance. Cincinnati Insurance, Cincinnati Casualty, and Cincinnati Indemnity are all headquartered in, and citizens of, the State of Ohio. According to Cincinnati Financial Corporation's 10-K for fiscal year ending December 31, 2019, it earned approximately $985,000,000.00 in "net written" commercial property insurance premiums in 2019, throughout the United States.

## JURISDICTION

12. This Court has diversity jurisdiction over the claims in this action arising under state law pursuant to 28 U.S.C. § 1332 because the members of the Insureds are citizens of Pennsylvania and the citizenship of the members of the Insureds is completely diverse from Cincinnati, and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13. The Court has personal jurisdiction over Cincinnati pursuant to the principles of due process and the Pennsylvania long-arm statute, 42 Pa. C.S.A. § 5301, *et seq.*, because of its transaction of business within Pennsylvania both specifically in relation to the facts giving rise to this action and during the general course of its business affairs. In 2019, Cincinnati earned

$263,000,000.00 in property casualty premiums in Pennsylvania, making Pennsylvania its sixth highest-earning state.

14. A substantial part of the events giving rise to the Insureds' claims occurred within the judicial district of the United States District Court for the Western District of Pennsylvania. Accordingly, venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### The Insureds Purchased an "All-Risk" Policy of Property Insurance That Broadly Provides Coverage for Loss of Business Income, Among Other Things

15. The Insureds purchased a contract of insurance from Cincinnati, whereby they agreed to make payments (in the form of premiums) to Cincinnati in exchange for its promise to indemnify the Insureds for losses at the Covered Property, including, but not limited to, business income losses.

16. The Insureds' contract of insurance with Cincinnati bears Policy Number ENP 012 37 24 (FM 502 07 08) (the "Policy") and is effective for the period of January 24, 2020 to January 24, 2021 (the "Policy Term"). (A copy of the Policy is attached as Exhibit 1 and made a part hereof.)

17. The Insureds paid all premiums owed to Cincinnati under the Policy, and Cincinnati accepted all such premiums paid by the Insureds.

18. The Policy is a form policy issued by Cincinnati.

19. The Insureds did not participate in the drafting or negotiation of the language used in the Policy.

20. The Insureds had no leverage or bargaining power to alter or negotiate the terms and conditions of the Policy.

21. The Policy is an "all-risk" policy, which provides the broadest property insurance coverage available, and provides (among other things) property, business personal property, business income and extra expense, civil authority order, and additional coverages.

22. The Policy provides coverage for "direct loss" to Covered Property at the "premises" caused by or resulting from any "Covered Cause of Loss."

23. The Policy defines "premises" as "the Locations and Buildings described in the Declarations."

24. The Policy defines "Covered Causes of Loss" as "direct 'loss' unless the 'loss' is excluded or limited in [the Policy]."

25. The Policy defines "Loss" as "accidental physical loss or accidental physical damage."

26. The Policy does not define the phrase "accidental physical loss or accidental physical damage."

27. However, the use of the disjunctive "or" in the phrase "accidental physical loss or accidental physical damage" means that coverage is triggered if either a physical loss of property or damage to property occurs. The concepts are separate and distinct and cannot be conflated.

28. Physical loss of, or damage to, property may be reasonably, and is necessarily, interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for ordinary human occupancy and/or continued use.

29. The Policy provides the Insureds with, inter alia, various business income and extra expense coverages during the Policy Term.

30. Under the Policy, Cincinnati agrees to pay for the actual loss of "Business Income" and "Rental Value" sustained by the Insureds due to the necessary suspension of operations caused

by direct "loss" to the "premises" caused by or resulting from "any Covered Cause of Loss." The Policy describes the covered premises as "1 Washington Federal Way, Falconi Field, Washington, PA 15301-5873," (the "Covered Property"), and coverage is listed for "Business Income w/Extra Expense" with a Limit of Insurance of "12 Months ALS [Actual Loss Sustained]."

31. Additional coverage is provided under the Policy for business income losses resulting from an "action of civil authority" which prohibits access to the Covered Property, related to a "Covered Cause of Loss" at property other than the Covered Property.

32. The Policy does not contain any virus exclusion.

33. COVID-19 is not a pollutant as defined in the Policy.

**In Response to Covid-19, Pennsylvania and Other State Governments Issue Sweeping Orders Shutting Down "Non-Essential" Businesses**

34. Severe acute respiratory syndrome coronavirus 2 ("COVID-19") has spread, and continues to spread, rapidly across the United States and has been declared a pandemic by the World Health Organization. *See* https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last accessed October 27, 2020).

35. The global COVID-19 pandemic is exacerbated by the fact that the deadly virus physically infects and stays on surfaces of objects or materials for many days.

36. According to a study published in *The New England Journal of Medicine*, COVID-19 is widely accepted as a cause of real physical loss and damage. It remains stable and transmittable in aerosols for up to 3 hours, up to 4 hours on copper, up to 24 hours on cardboard and up to 2 to 3 days on plastic and stainless steel. (*See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last accessed October 27, 2020)).

37. Another study, published in the *Journal of Hospital Infection*, found: "Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days.

At a temperature of 30°C or more the duration of persistence is shorter." (*See* https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces (last accessed October 27, 2020)).

38. On March 6, 2020, the Governor of Pennsylvania, Tom Wolf, declared a "Disaster Emergency," triggering a public health state of emergency in the Commonwealth of Pennsylvania due to COVID-19 .[1] Thereafter, on March 16, 2020, Governor Wolf announced that statewide mitigation efforts were being put into place starting on March 17, 2020, that closed sporting event facilities.[2]

39. On March 19, 2020, Governor Wolf issued an Executive Order closing all non-essential businesses, including those of the Insureds, until further notice. Specifically, the Executive Order, which became effective immediately upon its issuance, mandated that:

> No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public.[3]

---

[1] https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf (last accessed October 27, 2020); *see also* https://dced.pa.gov/download/letter-from-secretary-levine/?wpdmdl=93426&refresh=5e6d4f14ea1d11584221972 (last accessed October 27, 2020).

[2] https://www.governor.pa.gov/newsroom/gov-wolf-puts-statewide-covid-19-mitigation-efforts-in-effect-stresses-need-for-every-pennsylvanian-to-take-action-to-stop-the-spread/ (last accessed October 27, 2020).

[3] Governor Wolf, "Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses that are not Life Sustaining," (Mar. 19, 2020) https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf ("Executive Order") (last accessed October 27, 2020).

40. On March 23, 2020, Governor Wolf issued a Stay at Home Order for all residents of the Commonwealth of Pennsylvania, mandating that residents stay home "except as needed to access, support, or provide life-sustaining business, emergency, or government services."[4]

41. Also, on March 23, 2020, the Pennsylvania Department of Health issued a Stay at Home Order, directing all individuals residing in the Commonwealth to remain at home.[5]

42. On May 8, 2020, Governor Wolf announced the Commonwealth's plan to reopen certain counties within the Commonwealth, transitioning some categories of businesses in such counties to "yellow," including Washington County.[6] However, all businesses within the "entertainment" category, including "semiprofessional sports teams and clubs" and "other similar facilities," were required to continue to suspend in-person operations during the yellow phase.[7]

43. On June 12, 2020, Washington County transitioned to the "green phase"; however, Orders issued by Governor Wolf and the Secretary of Health on July 15, 2020, prohibited professional outdoor sporting events from having more than 250 total attendees, including staff and employees.[8]

---

[4] Governor Wolf, "Order of the Governor of the Commonwealth of Pennsylvania For Individuals to Stay Home," (Mar. 23, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/03/03.23.20-TWW-COVID-19-Stay-at-Home-Order.pdf (last accessed October 27, 2020).

[5] https://www.governor.pa.gov/wp-content/uploads/2020/03/03.23.20-SOH-Stay-at-Home-Order.pdf (last accessed October 27, 2020).

[6] https://www.governor.pa.gov/newsroom/gov-wolf-announces-13-counties-will-move-to-yellow-phase-of-reopening-on-may-15/ (last accessed October 27, 2020).

[7] https://www.scribd.com/document/452553495/NO-LONGER-UP-TO-DATE-Life-Sustaining-Business-FAQs (last accessed October 27, 2020).

[8] https://www.governor.pa.gov/newsroom/gov-wolf-12-more-counties-going-green-on-june-12/ (last accessed October 27, 2020); https://www.governor.pa.gov/covid-19/business-guidance/ (last accessed October 27, 2020); https://www.governor.pa.gov/newsroom/wolf-administration-announces-targeted-mitigation-efforts-in-response-to-recent-covid-case-increases/

- 8 -

- 9 -

44. On October 6, 2020, the July 15, 2020 Orders were amended to allow outdoor events with a maximum capacity of 2,001 to 10,000 people to operate at 20% of maximum capacity, effective October 9, 2020.[9]

45. Most other states have issued similar compulsory shut-down orders for "non-essential" businesses, or businesses deemed not to be "life sustaining."

46. The closure of all "non-life-sustaining businesses" evidences an acute awareness on the part of both state and local governments that COVID-19 causes loss of or damage to property. This is particularly true in places where business is conducted, as the contact and interaction necessarily incident to such businesses causes a heightened risk of the property becoming contaminated.

47. For example, a New York City Executive Order entered on March 16, 2020 specifically acknowledged that: "[COVID-19] physically is causing property loss and damage." (*See* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf (last accessed October 27, 2020)).

48. Similarly, in a March 16, 2020 proclamation, the City of New Orleans acknowledged COVID-19's "propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances." (*See* https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/ (last accessed October 27, 2020)).

---

(last accessed October 27, 2020); https://www.governor.pa.gov/covid-19/business-faq/ (last accessed October 27, 2020).

[9] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Guidance/Event-Occupancy.aspx (last accessed October 27, 2020).

49. In upholding Governor Wolf's Proclamation of a state-wide disaster and the Executive Orders mandating the closure of businesses within Pennsylvania, the Supreme Court of Pennsylvania noted the significant risk of the spread of the COVID-19 virus, even in locations where the disease has not been detected:

> Covid-19 does not spread because the virus is "at" a particular location. Instead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers of the virus are asymptomatic. Respondents' Brief at 4 (citing Coronavirus Disease 2019, "Symptoms," CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed 4/9/2020)). The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures. *Id.* (citing National Institutes of Health, "Study suggests new coronavirus may remain on surfaces for days," (Mar. 27, 2020) https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last accessed 4/9/2020) and Joshua Rabinowitz and Caroline Bartman, "These Coronavirus Exposures Might be the Most Dangerous," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html).

*Friends of DeVito v. Wolf*, 227 A.3d 872, 891 (Pa. 2020).

50. Because the COVID-19 virus can survive on surfaces for up to fourteen days, the Supreme Court of Pennsylvania ultimately concluded that "any location . . . where two or more people can congregate is within the disaster area." *Id.*

51. The CDC has warned that exposure to an individual with COVID-19 for fifteen minutes or more, or close contact within six feet of distance, is enough to justify a personal quarantine.[10]

52. Experts predicted that "a second wave" of COVID-19 cases for the fall and winter of 2020, coinciding with the flu season. As Dr. Robert Glatter, emergency physician at Lenox Hill

---

[10] https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html (last accessed October 27, 2020).

Hospital in New York City stated: "[the second wave] will likely be worse than the initial wave we experienced this spring."[11]

### The Insureds Submitted a Claim Under Their "All-Risk" Policy, and Cincinnati Wrongfully Refuses to Honor Its Obligations Under the Policy

53.     As a result of the orders, guidance and protocols issued by Governor Wolf, the Pennsylvania Department of Health, the WHO and the CDC relating to the Insureds' businesses (collectively the "Mandated Shutdown Rules"), the Covered Property closed on or around March 17, 2020.

54.     While Washington County transitioned to the "green phase" on June 12, 2020, professional outdoor sporting events were limited to 250 total attendees, including staff and employees, until October 9, 2020. Further, the league in connection with which the Insureds' semiprofessional baseball team and related businesses operate, was forced to suspend operations on June 24, 2020 due to the restrictions caused by COVID-19, the Mandatory Shutdown Rules, and other states' similar compulsory shut-down orders.

55.     The Insureds have incurred, and continue to incur, among other things, a substantial loss of business income, including additional expenses covered under the Policy, because of the Mandated Shutdown Rules.

56.     On May 18, 2020, the Insureds submitted a Property Loss Notice to Cincinnati, providing notice of their claim for interruption of business.

57.     Cincinnati refused to pay the Insureds' claim by letter September 17, 2020. (A copy of Cincinnati's 9/17/20 denial of coverage letter is attached as Exhibit 2 and made a part hereof.) Cincinnati improperly denied coverage on the purported basis that the Covered Property

---

[11]     https://www.healthline.com/health-news/what-a-covid-19-wave-in-the-fall-could-look-like#Educated-guesses-about-the-future (last accessed October 27, 2020).

did not sustain any direct physical loss or damage in the nature of physical damages to or alteration of the Covered Property.

### The Insureds' Losses Arise from Direct Physical Loss or Damage

58.     The Insureds' Covered Property suffered direct physical loss or damage due to the Mandated Shutdown Rules requiring them to discontinue their primary use of the Covered Property. The Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policy.

59.     Alternatively, and to the extent the Mandated Shutdown Rules do not constitute a Covered Cause of Loss within the meaning of the Policy, the COVID-19 public health emergency and the ubiquitous nature of the COVID-19 virus caused a direct physical loss or damage to the Insureds' Covered Property. Specifically, the Covered Property has been rendered unusable for its intended purpose because the highly contagious nature of COVID-19, particularly when people gather closely for extended periods of time, precludes any meaningful use of the Covered Property.

60.     Further, and as an additional basis for coverage under the Policy, the ubiquitous nature of the COVID-19 virus caused direct physical loss or damage to property other than the Insureds' Covered Property, and such loss or damage resulted in an "action by civil authority" prohibiting access to the Insureds' Covered Property, within the meaning of the Policy.

### COUNT I
### DECLARATORY RELIEF

61.     The averments of paragraphs 1 through 60 are incorporated by reference as if fully set forth herein.

62.     The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the

rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

63.　An actual controversy has arisen between the Insureds and Cincinnati as to the rights, duties, responsibilities and obligations of the parties in that the Insureds contend and Cincinnati disputes and denies that the Policy provides coverage to the Insureds for any current and future lost business income, subject to the limit of liability, for the necessary suspension of the Insureds' operations.

64.　The Insureds continue to suffer injury and are at risk of future loss as a result of Cincinnati's failure to abide by its coverage obligations under the Policy. The July 15, 2020 Executive Order by Governor Wolf demonstrates the risk of future loss to the Insureds. Furthermore, the mere occurrence, and increasing presence, of the COVID-19 virus in the United States in 2020 demonstrates the future risk that the Insureds could suffer property loss as a result of another widespread virus and related government shutdown orders.

65.　The Policy provides coverage for "direct 'loss' to Covered Property," with "loss" defined as "accidental physical loss or accidental physical damage."

66.　The Insureds' loss of use, loss of access, and loss of functionality of the Covered Property when the Mandated Shutdown Rules made it unlawful for the Insureds to fully access, use, and operate their businesses at the Covered Property, constitutes a "loss" to the Covered Property under the Policy. Alternatively, the ubiquitous nature of the COVID-19 virus caused a "loss" to the Covered Property by preventing the Insureds from using the Covered Property for its intended purpose.

67.　Additionally, the Mandated Shutdown Rules or, alternatively, the ubiquitous nature of the COVID-19 virus, caused a "loss" to property other than the Covered Property, thereby

invoking coverage under the Policy's "Civil Authority" provision for "actual loss of 'Business Income'... caused by action of civil authority that prohibits access to the 'premises.'"

68. The Policy constitutes a valid and binding agreement obligating Cincinnati to indemnify the Insureds for covered losses. The Insureds have substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the Policy and applicable law, or alternatively, the Insureds have been excused from performance by Cincinnati's acts, representations, conduct, or omissions.

69. Cincinnati has failed to indemnify the Insureds for their covered losses.

70. No exclusion to coverage applies.

71. The Insureds have suffered and continue to suffer a covered loss under the Policy.

72. The Insureds, therefore, seek a Declaratory Judgment that there is coverage for their business interruption losses under the Policy.

## COUNT II
## BREACH OF CONTRACT

73. The averments of paragraphs 1 through 72 are incorporated by reference as if fully set forth herein.

74. The Insureds and Cincinnati entered into a contract of insurance -- the Policy.

75. As an insurer, Cincinnati has a duty of good faith and fair dealing toward its Insureds, including, but not limited to, the obligation to pay for the financial losses suffered by the Insureds because of the Mandated Shutdown Rules.

76. The Insureds had a reasonable expectation that the financial losses suffered because of the Mandated Shutdown Rules would be covered under the Policy.

77. Under the Policy, Cincinnati agreed to indemnify the Insureds for their business losses as a result of a covered loss.

78. The Insureds suffered covered losses under the Policy.

79. The Insureds timely submitted a notice of claim and satisfied all conditions precedent to receiving the coverage they purchased from Cincinnati.

80. Cincinnati breached its contract with the Insureds by failing and refusing to provide the contracted-for coverage.

81. Cincinnati's breach of the contract has caused the Insureds to suffer damages in the amount of at least their unreimbursed business losses or their limits of liability.

## PRAYER FOR RELIEF

WHEREFORE, the Insureds demand judgment in their favor and against Cincinnati as follows:

1)    For a declaration that there is coverage under the Policy for the interruption to the Insureds' businesses and the associated business income lost therefrom;

2)    For damages, costs and attorney's fees; and

3)    For such other relief as the Court may deem proper.

**TRIAL BY JURY IS DEMANDED**

Date:   November 10, 2020

TUCKER ARENSBERG, P.C.

By:   */s/ Ryan James*
Ryan James (Pa. I.D. #82799)

One PPG Place
Suite 1500
Pittsburgh, PA 15222
rjames@tuckerlaw.com

*Attorneys for Plaintiffs*
